Filed 2/28/25

**CERTIFIED FOR PARTIAL PUBLICATION**\*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TIMOTHY RYAN, M.D., | B320677 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC606535) |
| COUNTY OF LOS ANGELES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan Bryant-Deason, Gregory Keosian, and William A. MacLaughlin, Judges.  Affirmed in part and reversed in part with directions.

Cannata, O'Toole & Olson, Therese Y. Cannata, Michael M. Ching, Zachary E. Colbeth, Aaron R. Field, and Irene Lee for Plaintiff and Appellant.

---

\*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II through IV of Ryan's Appeal.

Ballard Rosenberg Golper & Savitt, Linda Miller Savitt, John J. Manier, and Linda B. Hurevitz; Greines, Martin, Stein & Richland, Edward L. Xanders, and Marco A. Pulido for Defendant and Appellant.

———————————————

Dr. Timothy Ryan, a surgeon, was on the medical staff of Harbor-UCLA Medical Center (Harbor-UCLA) for six years.  He was terminated in October 2019 after his medical staff privileges lapsed and were not renewed.  Ryan sued the County of Los Angeles (County), which operates Harbor-UCLA, for retaliation in violation of three statutes:  (1) Health and Safety Code section 1278.5; (2) Labor Code section 1102.5; and (3) Government Code section 12653.  The trial court sustained the County's demurrer to the Health and Safety Code section 1278.5 claim, and a jury returned a split verdict on the remaining claims, finding for the County on the Labor Code section 1102.5 claim, for Ryan on the Government Code section 12653 claim, and awarding Ryan noneconomic damages of $2.1 million.  The trial court denied the County's motion for judgment notwithstanding the verdict and awarded Ryan costs and attorney fees in excess of $3 million.  Ryan appealed from the judgment, and the County appealed from the judgment and postjudgment orders.

On appeal, the County contends it was entitled to judgment notwithstanding the verdict on Ryan's Government Code section 12653 claim, and thus judgment should have been entered in its favor.  Ryan contends the trial court erred by sustaining the County's demurrer to the Health and Safety Code

2

section 1278.5 claim, granting the County's motion for summary adjudication as to the wrongful termination aspect of Ryan's Labor and Government Code claims, and denying Ryan's motion to amend his complaint to add an additional cause of action under Civil Code section 52.1.

We conclude:  (1)  The County was entitled to judgment notwithstanding the verdict on the Government Code section 12653 claim; (2) the trial court erred by sustaining the County's demurrer to the Health and Safety Code section 1278.5 claim; (3) the trial court properly granted the County's motion for summary adjudication of Ryan's Labor Code section 1102.5 wrongful termination claim; and (4) the trial court did not abuse its discretion in denying Ryan's motion to amend his complaint. We therefore enter judgment for the County on the Government Code section 12653 claim, return the Health and Safety Code section 1278.5 claim to the trial court for further proceedings, and otherwise affirm the judgment.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Background.

Ryan is a vascular surgeon.  He was on the medical staff of Harbor-UCLA, a County operated facility, from October 2013 to October 2018, reporting to Dr. Rodney White, Chief of the Division of Vascular Surgery, from 2013 to 2015.

---

[1]    We previously deferred ruling on Ryan's motions for judicial notice, filed April 26, 2023 and April 4, 2024.  We now deny them.

In December 2013, Ryan treated Bernetta Higgins (Higgins or B.H.) for an acute aortic dissection.[2] Ryan prescribed medication for Higgins's condition, which he concluded did not require surgery. The following month, Ryan was copied on an email written by Dr. White's nurse that Ryan believed suggested Higgins had been coached to come into the emergency room the next day complaining of feigned chest pain. The email said: "Just wanted to inform you that we informed [Higgins] to come through the ER tomorrow morning complaining of chest pain. She has Health Net HMO. We would not be able to get authorization in time for us to do the CT scan. [¶] Dr. White [and] I spoke with the patient earlier this afternoon. This is our best option at this point."

Higgins was admitted to Harbor-UCLA on January 9, 2014. Four days later, at Dr. White's direction, Dr. Carlos Donayre operated on Higgins, surgically implanting two aortic stents. Higgins suffered a stroke during surgery.

Ryan believed that Dr. White encouraged Higgins to have the aortic stents implanted because he received a financial incentive from the stent's manufacturer, Medtronic. Ryan also believed that Dr. White falsified Higgins's medical records to justify the unnecessary surgery. Beginning in February 2014, Ryan reported his concerns to several County officials, including Harbor-UCLA's Chief Medical Officer, Chief of Surgery, Senior Vascular Surgeon, and CEO. Ryan also reported his suspicions that medical records had been falsified to the County's Director of

---

[2] An aortic dissection is a tear in the inner layer of the aorta, the body's main artery. (<https://www.mayoclinic.org/diseases-conditions/aortic-dissection/symptoms-causes/syc-20369496> [as of Feb. 27, 2025], archived at <https://perma.cc/X6F-27MD>.)

4

Healthcare Services and the Los Angeles County District Attorney's Office. Finally, Ryan reported Dr. White's allegedly illegal conduct to various County departments.

Also in 2014, Ryan came to believe that Drs. White and Donayre had misrepresented their credentials to the National Institutes of Health (NIH) in connection with an NIH-funded medical trial. Ryan reported his suspicions to Harbor-UCLA's Chief Medical Officer and the NIH.

In August 2015, Dr. White sent a letter to Harbor-UCLA's Professional Staff Association (PSA) accusing Ryan of requesting confidential information about Dr. White's patients, attempting to read Dr. White's files, and falsely accusing Dr. White of plagiarism. Dr. White asked the PSA to take corrective action against Ryan "because he has engaged in conduct detrimental to the delivery of quality patient care, disruptive and deleterious to the operations of the Medical Center, the improper use of Medical Center resources, and below applicable professional standards." Several months later, Dr. White supplemented his request for corrective action, asserting that Ryan's "continuing pattern of harassment" was "having a severe adverse impact on me, as a member of the medical staff, and on my personal and professional life."

## II.    Ryan's complaint; the County's demurrer.

In October 2015, Ryan filed a government claim with the County asserting that beginning in about June 2015, Dr. White "engaged in a long and systematic course of retaliation against" him. Ryan then filed the present action in January 2016, asserting two causes of action: (1) retaliation in violation of Health and Safety Code section 1278.5, and (2) retaliation in

5

violation of Labor Code section 1102.5.[3] Ryan's complaint alleged that he had been asked to participate in an unnecessary surgery on a patient who was not experiencing chest pains and did not need a stent. Ryan reported the unnecessary procedure and his more general concerns that Dr. White and other surgeons were compromising patient care in exchange for kickbacks from medical device manufacturers, and he filed a complaint with the California Medical Board. Subsequently, Ryan "learned of additional instances of conduct by Dr. White which Dr. Ryan suspected to be unethical or illegal and affecting patient safety, including falsifying case records in order to appear eligible to participate in NIH-sponsored clinical trials, and shared these concerns with [Harbor-UCLA] and an NIH compliance officer." Thereafter, Dr. White and others retaliated against Ryan by not referring him cases, marginalizing Ryan within the department, submitting Ryan's research as Dr. White's own, and filing a frivolous lawsuit against Ryan in July 2015. The County "had knowledge of the above acts of retaliation yet . . . failed to protect Dr. Ryan from the intolerable working conditions."

The County demurred to the first cause of action, asserting that it was not a proper defendant to a Health and Safety Code section 1278.5 retaliation claim. The trial court agreed and sustained the demurrer without leave to amend.

---

[3] In brief, Health and Safety Code section 1278.5, subdivision (b)(1) provides that a health facility shall not retaliate against a member of the medical staff for filing a complaint or participating in an investigation, and Labor Code section 1102.5 provides that an employer shall not retaliate against an employee for disclosing a potential violation of law.

## III.  Ad hoc committee investigation of Ryan.

In response to Dr. White's request for corrective action, the PSA appointed an ad hoc committee to conduct a Focused Professional Practice Evaluation (FPPE) of Ryan.  Members of the ad hoc committee (committee) interviewed surgeons, fellows, and nurses who had worked with Ryan.  The committee reported that many members of Harbor-UCLA's vascular division had seen Ryan looking at Dr. White's personal files, mail, and private patient information without authorization, and many reported a pattern of aggressive or abusive behavior by Ryan.  The committee summarized its findings as follows:  "Almost all interviewees described Dr. Ryan's behavior as aggressive and verbally abusive to nurses, fellows and, at times, to patients.  They described a hostile work environment where some members felt threatened and did not desire to be part of the vascular work team.  Several of those interviewed stated that they feel very intimidated and often think about leaving their jobs.  Nurses and nurse practitioners who were interviewed felt that they can't continue to work with Dr. Ryan unless he changes his behavior.  Dr. Ryan was reported to have a pattern of publicly criticizing the patient management of other members of the team.  Multiple interviewees expressed the opinion that they had lost a valuable longstanding member (Dr. Carlos Donayre) of the Vascular Section due to Dr. Ryan's confrontational personality.  The impending departure of Dr. Donayre was viewed as very detrimental to the development or even existence of a strong vascular surgery program at Harbor.  Dr. Donayre confirmed that he is leaving Harbor due to the behavior of Dr. Ryan.  Members of Vascular Surgery who were interviewed liked Dr. White and felt that Dr. White always did the best for them personally and

7

professionally.  Some stated that Dr. Ryan is trying to destroy Dr. White and his research program. . . .

"Interviewees stated that the impending departure of Dr. Donayre will have a significant adverse impact on the future educational development of the vascular program. . . .  The vascular fellows uniformly confirmed that if Dr. White leaves this program, no one will consider Harbor training with any great enthusiasm. . . .  Several fellows stated that Dr. Ryan had yelled at them, that they felt intimidated, and that it would be hard to recommend Harbor to future fellows due to the environment created by Dr. Ryan.  Vascular fellows stated that they don't trust Dr. Ryan and didn't want to ask for any letters of recommendation from him. . . .

"A number of interviewees felt that while Dr. Ryan is a capable surgeon, his behavior has been detrimental to patient care.  Several fellows indicated that Dr. Ryan has yelled at them in front of patients.  A number of interviewees noted that the poor communication between Dr. Ryan and the other vascular attending physicians has the potential or already has adversely impacted patient care.  Separate operating room suites must now be run so that Dr. Ryan has his own operative area.  The impending loss of experienced faculty members in the division may also impair patient care."

The committee report concluded:  "The Ad Hoc Committee believes that Dr. Ryan's behavior is well below expected standards for professional conduct.  Further, the committee believes that Dr. Ryan's behavior has had serious adverse impacts on the wellbeing of many health care professionals including attending physicians, physician trainees, nurses and other ancillary staff."  The committee recommended that the

8

Medical Executive Committee (executive committee) "should explore possible actions to remedy the underlying chaotic situation in the vascular division created by Dr. Ryan's unprofessional behavior. Dismissal from the medical staff or discontinuation of medical privileges are options that can [be] considered but . . . [a]t a minimum, we believe that Dr. Ryan should receive professional counseling regarding his behavior, that behavioral limits should be set, and that ongoing monitoring of his interactions with others should take place until the problem is believed to be resolved."

In June 2016, the PSA notified Dr. Ryan of the committee's recommendations and asked him to appear before the executive committee. Thereafter, the executive committee voted to require Ryan to enter into a Professional Staff Behavioral Agreement (agreement) and to revoke Ryan's medical staff privileges if Ryan refused to sign the agreement or breached its terms.

The PSA asked Ryan to sign the agreement in September 2016. The agreement recited that Ryan had been involved in multiple incidents of unprofessional behavior, including demeaning and intimidating behavior towards peers, residents, and staff; unprofessional and inappropriate criticism of other physicians in the presence of others, including patients; and inappropriate access of personnel and patient files. The agreement required Ryan to comply with professional standards, refrain from making demeaning or discourteous comments or demands of others, address criticisms or concerns about others in a private and courteous manner, participate in an anger management program, and consult with a psychologist or psychiatrist. Ryan refused to sign the agreement, believing it to be "another link in the retaliatory scheme against [him]."

9

## IV.    Ryan's loss of staff privileges and termination by Harbor-UCLA.

In October 2016, the executive committee informed Ryan that it intended to revoke his medical staff privileges because he had refused to sign the agreement.  Ryan requested a formal hearing on the proposed revocation, and the parties thereafter appeared before a Judicial Review Committee appointed by the executive committee.

Meanwhile, while the Judicial Review Committee hearing was pending, Ryan's staff privileges came up for regular bi-annual renewal.  Ryan submitted a reappointment application, which contained the following releases:  (1) "I release from liability the County of Los Angeles, the Association, and Professional Schools, and their respective officers, employees or agents, for any of their acts performed in good faith and without malice in connection with evaluating my qualifications and credentials;" and (2) "I release from any liability all individuals and organizations who provide information to the above in good faith and without malice concerning my competence, ethics, character, health status, and other qualifications for Association membership and clinical privileges, including otherwise privilege[d] or confidential information."  Ryan crossed out "I release" in each of these sentences and wrote "I do not release."

The PSA informed Ryan in September 2017 that it could not process his reappointment application because he had altered the application's release language.  The following month, the PSA told Ryan it could not evaluate his request for reappointment until he signed the releases, gave him 30 days to submit an unaltered application, and advised him that if a revised application was not received, his request for reappointment "is

10

subject to be deemed withdrawn or denied."  In the interim, Ryan's "privileges and membership remain intact."

In December 2017, Ryan told the PSA he "cannot waive any liability for any action taken with respect to my privilege renewal application nor can I agree to release the county or members of the PSA from liability for their retaliatory actions against me." He invited County Counsel to discuss with his attorneys "potentially more limited waiver language that would be acceptable to all parties."

In May 2018, the PSA's counsel advised Ryan's counsel that by signing the releases, Ryan would not be abandoning his pending civil litigation because the release language was "purely prospective."  The PSA's counsel also advised that Ryan's refusal to sign the unaltered releases prevented the PSA from fully evaluating Ryan's qualifications and violated his obligations under the PSA's bylaws.  The PSA's counsel advised that if Ryan did not sign and return the unaltered releases within 30 days, "his reappointment application will be deemed incomplete and Dr. Ryan's privileges will lapse."

The deadline for Ryan to submit an unaltered application was extended several times, finally expiring on June 13, 2018. Ryan did not sign and return the unaltered release, and Ryan's privileges lapsed on June 14, 2018.  The next day, Harbor-UCLA placed Ryan on ordered absence.

In late June 2018, counsel for Ryan and for the PSA jointly informed the Judicial Review Committee's hearing officer that Ryan's staff privileges at Harbor-UCLA had lapsed, and Ryan's challenge to the earlier proposed revocation of his staff privileges therefore was moot.  The parties requested that the hearing

11

officer "dismiss the hearing without determination on the merits."

Harbor-UCLA discharged Ryan in October 2018. The written discharge notice stated that the County's action was "based on your lack of clinical privileges which prevents you from providing patient care."

Ryan challenged his termination before the Civil Service Commission, which held a hearing in March 2019. In June 2019, the Commissioner found that the application's release language was dictated by PSA bylaws, had been vetted by legal counsel, and could not be customized or altered by individual physicians. Further, "without a valid, up-to-date credential, a physician cannot not be granted privileges to provide medical treatment at a hospital." Thus, "when [Ryan] refused to complete the form because of his objection to the release-from-liability language, the PSA was left with no option other than to terminate his employment at Harbor-UCLA." The Commissioner found no evidence that the PSA improperly manipulated the credentialing process; rather, "[Ryan's] unwillingness to agree to sign the application with the release-from-liability language was the reason he was denied privileges and was discharged." The Commissioner also found that case law did not support the conclusion that the release language used by Harbor-UCLA was illegal or against public policy. Thus, the Commissioner concluded that Ryan violated the hospital's bylaws by failing to maintain his membership in the PSA and was properly discharged. The Civil Service Commission approved the Commissioner's findings in January 2020.

12

## V. Pretrial proceedings.

### A. Ryan's first amended complaint; County's demurrer.

Ryan filed a first amended complaint in the present action in March 2019. The first amended complaint (1) amended the Labor Code section 1102.5 claim by adding new allegations that the County retaliated against Ryan by unlawfully revoking his clinical privileges and terminating his employment, and (2) added a new cause of action for retaliation in violation of the California False Claims Act (CFCA) (Gov. Code, § 12650 et seq.).

The County demurred to the new cause of action, asserting that as a government entity, it could not be liable for retaliation under the CFCA. The trial court overruled the demurrer.

### B. County's motion for summary adjudication.

The County filed a motion for summary adjudication in February 2021. The County sought summary adjudication of a variety of issues, including of Ryan's claim that his termination violated Labor Code section 1102.5 and Government Code section 12653. The County contended that the reappointment application's release language was prescribed by the PSA's bylaws and could not be changed without approval by the County Board of Supervisors. The County thus urged that Ryan's refusal to sign unaltered releases "was the sole reason the PSA deemed his membership and privileges to have lapsed."

Ryan opposed the motion for summary adjudication, contending that triable issues of fact existed as to whether there was a causal nexus between his protected disclosures and his termination. He urged that the releases in the reappointment application were much broader than required by California law,

13

and the County did not need Ryan to sign the releases in order to review his credentials. Further, the PSA bylaws did not contemplate a "lapse" of a physician's privileges, and the County's revocation of his medical staff privileges was the final act of retaliation against him. Ryan asserted: "Simply because the County backed Dr. Ryan into a corner with a frivolous [agreement] and then improperly demanded that he agree to an inapplicable and illegal release of his rights in the middle of this lawsuit, does not break the chain of causation here. Rather, it adds links in the chain. These are questions of fact for the jury as to why Dr. Ryan refused to sign these documents, and why the County was so insistent that he sign them without any meaningful discussion or negotiations." (Capitalization omitted.)

In June 2021, the trial court granted the motion for summary adjudication of Ryan's claims of wrongful termination in violation of Labor Code section 1102.5 and Government Code section 12653. The court explained: "[T]he undisputed evidence shows that Plaintiff was not terminated because of the investigation, but because of his refusal to sign the standard release form required of all applicants for clinical privileges. On this point, Defendant has satisfied its burden to show no triable issues exist as to whether Plaintiff's loss of privileges and termination were the result of a legitimate, nonretaliatory reason—i.e., Plaintiff's failure to agree to the standard release. And Plaintiff in opposition has not shown the existence of a triable issue of fact as to whether the proffered reason is pretext for retaliation.

"The release that Plaintiff refused to sign was not submitted particularly to him, but was generally required of applicants for PSA privileges by the PSA's bylaws. Plaintiff had

14

in fact signed the same release on two prior occasions, and the request that he sign it in this instance was not retaliatory. The only difference, as Plaintiff acknowledges, was that this time Plaintiff had litigation pending with the County and its employees. He thus feared a waiver of his rights as to those claims. Yet the release at issue did not purport to affect those claims; as Defendant notes in its motion, the claims only release liability for 'acts performed in good faith and without malice,' a far cry from Plaintiff's claims that County deliberately retaliated against him. Plaintiff in opposition does not articulate a rationale as to why the release would have impeded his litigation.

"The statutory language that Plaintiff relies on does not support his claim either. It might show that the release that Defendant demanded was not required by the applicable statutes . . . [b]ut the fact that the release . . . was broader than statutorily required is not an indication of retaliatory animus against Plaintiff in particular. And if Plaintiff means by this argument merely to show that the release was unnecessary, and therefore subject to negotiation, he does not account for the fact that the release was mandated by the PSA bylaws, which are subject to change only by the approval of the County Board of Supervisors. Thus a waiver or negotiation of the language in this case was a non-starter. [¶] Nor has any showing been made that the termination of Plaintiff's privileges in 2018—whether characterized as a lapse or a revocation—was the product of a deliberate retaliatory scheme."

15

### C. Ryan's motion for leave to file a second amended complaint.

In October 2021, Ryan sought leave to file a second amended complaint adding a cause of action under the Bane Act, Civil Code section 52.1. The trial court denied the motion.

## VI. Trial.

Trial began in January 2022 and continued through March 2022 on the remaining causes of action for violations of Labor Code section 1102.5 and the CFCA. At the conclusion of trial, the jury returned a verdict for the County on the Labor Code section 1102.5 claim, and for Ryan on the CFCA claim. As to the Labor Code section 1102.5 claim, the jury found:

1. Ryan disclosed what he believed was illegal conduct;

2. Ryan had reasonable cause to believe that the information disclosed violated a statute or regulation;

3. The County took adverse action against Ryan; but

4. Ryan's disclosure was <u>not</u> a contributing factor in the County's adverse action against him.

As to the CFCA claim, the jury found:

1. Ryan reported what he believed was the creation of a false medical record in order to submit a false claim to Medi-Cal;

2. Ryan acted to stop a false claim;

3. The County took adverse action against Ryan;

4. Ryan's acts to stop a false claim were a substantial motivating reason for the County's decision to take adverse action against Ryan, and the County's conduct was a substantial factor in causing harm to Ryan.

The jury awarded Ryan $0 for past and future lost earnings, $2 million for past mental suffering and emotional

distress, and $100,000 for future mental suffering and emotional distress. The trial court entered a judgment on special verdict on April 20, 2022.

## VII. Posttrial motions.

The County filed a motion for judgment notwithstanding the verdict. Among other things, the County urged that it is not a "person" within the meaning of the CFCA, and thus it cannot be liable under the statute. The court rejected this contention, finding that the trial judge initially assigned to the case had held that a public entity can be liable for retaliating against an employee who reports a false claim, and " '[g]enerally, one trial court judge may not reconsider and overrule an interim ruling of another trial judge.' "

Subsequently, the trial court awarded Ryan costs and attorney fees in excess of $3.2 million.

Ryan and the County appealed from the judgment, and the County appealed from the postjudgment orders.

**COUNTY'S APPEAL**

The County contends it was entitled to judgment notwithstanding the verdict on Ryan's CFCA claim because, as a matter of law, public entities cannot be liable under the CFCA.[4] Ryan responds that this court lacks jurisdiction to consider the County's appeal because the County did not timely serve the

---

[4] Alternatively, the County contends that Ryan suffered no actionable adverse conduct resulting from activity protected by the CFCA. We need not reach this issue because, as we discuss, we conclude that the County was not subject to suit under section 12653 of the CFCA.

Attorney General with notice of its appeal and, alternatively, the County is a proper CFCA defendant.

As we discuss, we may consider the County's appeal because the County substantially complied with the CFCA's service requirement. On the merits, we conclude that the County was entitled to judgment notwithstanding the verdict.

## I.     The court has jurisdiction to hear the County's appeal.

Preliminarily, we address Ryan's contention that this court lacks jurisdiction to consider the County's appeal because the County did not comply with the CFCA's notice provision, Government Code[5] section 12656. We disagree.

Section 12656 provides that if a violation of the CFCA is alleged on appeal, "the person or political subdivision that commenced that proceeding shall serve a copy of the notice or petition initiating the proceeding, and a copy of each paper, including briefs, that the person or political subdivision files in the proceeding within three days of the filing, on the Attorney General, directed to the attention of the False Claims Section in Sacramento, California." (§ 12656, subd. (a).) Timely compliance with the service requirement "is a jurisdictional prerequisite to the entry of judgment, order, or decision construing or applying this article by the court in which the proceeding occurs, except that within that three-day period or thereafter, the time for compliance may be extended by the court for good cause." (§ 12656, subd. (b).)

---

[5]     For purposes of this section only, undesignated statutory references are to the Government Code.

The County concedes that it did not serve the Attorney General with its notice of appeal, but it urges it provided the state with sufficient notice of the appellate proceeding because it timely served the Attorney General with its appellant's opening brief. We agree. The legislative history of section 12656 explains that the statute was intended to protect the state from inadequate prosecution of CFCA appeals by private litigants. (See Assem. Conc. Sen. Amends. to Assem. Bill No. 222 (2001–2002 Reg. Sess.) as amended June 19, 2001, p. 3.) As noted in a committee report: "The Attorney General, who sponsors the bill, states that the CFCA's provision for qui tam plaintiffs 'serves to increase the discovery and prosecution of frauds committed on the government, but it also creates a risk of ill-informed or inconsistent legal precedents being established at the appellate court level.' This risk exists because a private plaintiff 'may not have the resources, expertise, or inclination to posit and fully advocate legal positions at the appellate level' that adequately serve the CFCA's goals, or because a private plaintiff 'may be less capable or more narrowly motivated to simply maximize his or her financial gain.' [¶] The Attorney General notes that, although the law provides the opportunity to file amicus curiae . . . briefs in matters on appeal, too often the Attorney General learns of CFCA appellate proceedings 'only through the media, voluntary notice, or happenstance.' Without required notice of these appeals, and an opportunity to be heard, 'the State and local governments will be adversely impacted by the increased risk of inconsistent and ill-informed legal precedents,' reducing the overall effectiveness of the CFCA. [¶] This bill would address this problem by requiring that the Attorney General receive prompt notice of CFCA issues presented for appellate

19

review, providing it with the opportunity to be heard in the appeal." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 222 (2001–2002 Reg. Sess.) as amended June 19, 2001, p. 3.)

Section 12656 was modeled on Business and Professions Code section 17209, which requires notice to the Attorney General of any appeal of a claim under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.). (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 222, *supra*, p. 3.) As originally enacted, the UCL required service on the Attorney General of notice of an appeal of a UCL action within three days of the filing of the appellate proceeding. (Former Bus. & Prof. Code, § 17209.) In *Californians for Population Stabilization v. Hewlett-Packard Co.* (1997) 58 Cal.App.4th 273, 283 (*Californians*), overruled on other grounds in *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 175, the Court of Appeal held that the UCL statutory service requirement was satisfied by timely service of appellant's opening brief. The court explained that the service requirement was intended to inform the Attorney General and local district attorneys of the issues to be raised on appeal to allow the state to intervene if appropriate. In view of this purpose, the court saw "little point in requiring that these persons be served with the notice of appeal within three days of its filing. . . . [R]eceipt of a notice of appeal provides the Attorney General and local district attorney no useful information. There is no requirement that the notice state it is an appeal from a[n] unfair competition action, let alone set forth the issues to be raised on appeal. [¶] We believe a more reasonable interpretation of the statute is that the Attorney General and

20

local district attorney must be served with the appellant's opening brief within three days of its being filed.  It is not until this point that the issues on appeal are specifically set forth, and a determination may be made whether to file an amicus curiae brief.  [Fn. omitted.]  If the Attorney General and/or the local district attorney are not served with the opening briefs within three days of their being filed, and if time for serving the brief has not been extended for good cause shown, no judgment or relief may be granted by the court." (*Californians*, at p. 285.)

We adopt *Californians*'s reasoning to conclude that an appellant complies with section 12656 by timely serving a copy of its opening brief on the Attorney General.  Because the County did so in this case, there was no violation of section 12656.  In the alternative, we conclude that good cause exists to extend the time for compliance to the date of actual service of the County's opening brief.

## II.  The County is entitled to judgment notwithstanding the verdict on Ryan's CFCA claim.

The County contends it was entitled to judgment notwithstanding the verdict on Ryan's CFCA retaliation claim because section 12653 does not apply to public entities.  Under the facts of this case, we agree.

### A.  Legal principles and standard of review.

"A trial court must render judgment notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted"—that is, "if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th

21

62, 68.)  Our review is de novo.  (*Epochal Enterprises, Inc. v. LF Encinitas Properties, LLC* (2024) 99 Cal.App.5th 44, 54.)

In deciding questions of statutory interpretation, we "are guided by familiar principles.  'Our fundamental task is to ascertain the Legislature's intent and effectuate the law's purpose, giving the statutory language its plain and commonsense meaning.  [Citation.]  We examine that language in the context of the entire statutory framework to discern its scope and purpose and to harmonize the various parts of the enactment.'  [Citation.]  If the language is clear, ' "its plain meaning controls.  If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." ' " (*Stone v. Alameda Health System* (2024) 16 Cal.5th 1040, 1052 (*Stone*).)

When construing a statute, courts frequently consult interpretive maxims.  " 'A traditional rule of statutory construction' relevant here 'is that, absent express words to the contrary, governmental agencies are not included within the general words of a statute.'  (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1192 (*Wells*).)" (*Stone, supra,* 16 Cal.5th at p. 1053.)  "This interpretive maxim is modified by a caveat, however.  The ' "rule excludes government agencies from the operation of general statutory provisions only if their inclusion would result in an infringement upon sovereign governmental powers." ' [Citation.]  Like the rule, the caveat is well established.  Early cases explained that 'the state is not bound by general words in a statute' if they 'would operate to trench upon [the state's] sovereign rights, injuriously affect its capacity to perform its functions, or establish a right of action

22

against it.' [Citations.] 'Where, however, no impairment of sovereign powers would result, the reason underlying th[e] rule of construction ceases to exist and the Legislature may properly be held to have intended that the statute apply to governmental bodies even though it used general statutory language only.' [Citation.]" (*Ibid.*)

Our Supreme Court has cautioned that "the sovereign powers caveat, like the rule it modifies, 'is simply a maxim of statutory construction. While the "sovereign powers" principle can help resolve an unclear legislative intent, it cannot override positive indicia of a contrary legislative intent.' (*Wells*, *supra*, 39 Cal.4th at p. 1193.) We must examine 'the language, structure, and history of the particular statute[s] before us' to determine whether the Legislature intended to impose their requirements on public [entities]. (*Ibid.*) Although interpretive maxims may aid in that analysis, the fundamental question is always one of legislative intent." (*Stone*, *supra*, 16 Cal.5th at p. 1054.)

### B.    The CFCA.

The CFCA imposes liability on "[a]ny person" who, among other things, "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval" or "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim." (§ 12651, subds. (a)(1), (2).) A CFCA false claims action may be brought by the Attorney General, a local prosecutor, or a private person (referred to as a " 'qui tam plaintiff' " or " 'relator' "). (§ 12652, subds. (a)(1), (b)(1), (c)(1); *State ex rel. Sills v. Gharib-Danesh* (2023) 88 Cal.App.5th 824, 833–835.) If a complaint is filed by a private person, it must be filed under seal and served

on the Attorney General along with a written disclosure of substantially all material evidence and information the person possesses. (§ 12652, subds. (c)(2) & (3).) If the alleged false claim involves exclusively funds of a political subdivision, such as a county or city, the Attorney General shall forward the complaint and disclosures to a local prosecutor. (§ 12652, subd. (c)(7)(A).) If the Attorney General or local prosecutor elects to intervene, the state or local public entity "shall have the primary responsibility for prosecuting the action." (§ 12652, subd. (e)(1).) If the Attorney General or local prosecutor elects not to intervene, "the seal shall be lifted and the qui tam plaintiff shall have the right to conduct the action." (§ 12652, subd. (c)(6)(B).) In that case, "the qui tam plaintiff shall have the same right to conduct the action as the Attorney General or prosecuting authority would have had if it had chosen to proceed." (§ 12652, subd. (f)(1).)

Whether or not a government entity intervenes, the qui tam plaintiff is entitled to a percentage of any recovery obtained on behalf of the government. (§ 12652, subd. (g)(2).) Thus, "[a] substantial portion of the proceeds of any settlement or court award in a CFCA action—as much as 66 percent—does not revert to the general coffers of the state or the political subdivision against which the false claim was submitted. Instead, a significant 'cut' of these proceeds goes to those who pursued the action on behalf of the defrauded entity." (*Wells*, *supra*, 39 Cal.4th at p. 1188.)

The CFCA's anti-retaliation provisions are set forth in section 12653. That section provides:

"(a) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged,

24

demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of that employee's, contractor's, or agent's employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this section or other efforts to stop one or more violations of this article.

"(b)  Relief under this section shall include reinstatement with the same seniority status that the employee, contractor, or agent would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, and, where appropriate, punitive damages.  The defendant shall also be required to pay litigation costs and reasonable attorney's fees.  An action under this section may be brought in the appropriate superior court of the state.

"(c)  A civil action under this section shall not be brought more than three years after the date when the retaliation occurred."

## C.     *Wells v. One2One Learning Foundation.*

In *Wells*, *supra*, 39 Cal.4th 1164, 1178–1179, our Supreme Court considered whether public entities may be sued under the CFCA for submitting false claims.  *Wells* was brought by charter school students and their parents against three charter schools and two public school districts.  (*Id.* at p. 1180.)  The plaintiffs alleged that the charter schools received state funds based on average daily attendance but did not provide any student instruction or assessment.  (*Id.* at pp. 1178, 1180.)  The complaint therefore alleged the submission of false claims to the state—for per-pupil funding by the charter schools, and for supervisory services by the school districts.  (*Id.* at p. 1183.)

25

The Supreme Court held that the CFCA claims were cognizable against the charter schools, but not against the public school districts.  The court explained that pursuant to traditional rules of statutory construction, absent express words to the contrary, governmental agencies are not included within the general rules of a statute.  (*Wells*, *supra*, 39 Cal.4th at p. 1192.)  Section 12651 permits the Attorney General to bring a CFCA action against any "person" who submits a false claim upon state funds, and section 12650 defines "person" to "include[ ] any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust." (*Wells*, at p. 1187.)  The court noted that while this list "is not necessarily comprehensive," the "only words and phrases it uses are those most commonly associated with private individuals and entities."  (*Id*. at p. 1190.)  Moreover, the bill that became the CFCA initially defined "persons" to include any " 'district, county, city and county, city, the state, and any of the agencies and political subdivisions of these entities," but an amendment excised the references to governmental entities.  (*Id*. at p. 1191, italics omitted.)  Accordingly, the court said, "[t]he language, structure, and history of the particular statute before us—the CFCA—strongly suggest that public entities, including public school districts, are not 'persons' subject to suit under the law's provisions.  On that basis alone, we are persuaded that governmental agencies, including the district defendants in this case, may not be sued under California's false claims statute." (*Id*. at p. 1193.)

The court further explained that the voters "by initiative, have put all agencies of government, including school districts, on a strict fiscal diet by adding provisions to the California

26

Constitution that limit their power to tax and spend." (*Wells, supra*, 39 Cal.4th at p. 1194.) School districts "must use the limited funds at their disposal to carry out the state's constitutionally mandated duty to provide a system of public education." (*Id.* at p. 1195.) If found liable under the CFCA, school districts "could face judgments—payable from their limited funds—of at least *two*, and usually *three*, times the damage caused by each false submission, *plus* civil penalties of up to $10,000 for each false claim, plus costs of suit. Such exposure, disproportionate to the harm caused to the treasury, could jeopardize a district financially for years to come. . . . [¶] . . . Given these conditions, we cannot lightly presume an intent to force such entities not only to make whole the fellow agencies they defrauded, but also to pay huge additional amounts, often into the pockets of outside parties." (*Id.* at pp. 1195–1196.)

The court continued: " ' "[T]he ultimate purpose of the [CFCA] is to protect the public fisc." ' [Citation.] Given that school district finances are largely dependent on and intertwined with state financial aid [citation], the assessment of double and treble damages, as well as other penalties, to school districts would not advance that purpose. [¶] Of course, where liability otherwise exists, public entities must pay legal judgments from their limited revenues and appropriations, even if they cannot exceed their tax or appropriations ceilings to do so and must therefore cut spending in other areas. [Citations.] This obligation, in and of itself, does not infringe their 'sovereign powers.' But we may consider the effect on sovereign powers when we are determining whether the Legislature *intended*, by mere implication, to expose a public entity to a particular statutory liability." (*Wells, supra*, 39 Cal.4th at p. 1196.) Thus,

27

the court concluded, "the Legislature did not intend to subject financially constrained school districts—or any agency of state or local government—to the treble-damages-plus-penalties provisions of the CFCA." (*Id.* at pp. 1196–1197; see also *id.* at p. 1199 ["We conclude that neither [school] districts, nor any other agencies of state and local government, are 'persons' subject to suit under the CFCA"]; *State ex rel. Harris v. PricewaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220, 1237 ["the Legislature did not intend the CFCA to apply to public entities"].)

### D. Under section 12653's plain language, the County is not a proper defendant in this CFCA retaliation action.

The County urges that the trial court erred by denying the County's motion for judgment notwithstanding the verdict on Ryan's section 12653 claim because under *Wells*, government agencies are not subject to suit under the CFCA. We agree with the County that some of *Wells*'s language arguably is broad enough to suggest that public entities are not subject to suit under *any* of the CFCA's provisions. (E.g., *Wells, supra,* 39 Cal.4th at pp. 1193 ["[W]e are persuaded that governmental agencies . . . may not be sued under California's false claims statute"], 1199 ["neither [public school districts], nor any other agencies of state and local government, are 'persons' subject to suit under the CFCA"].) However, "[i]t is axiomatic that cases are not authority for propositions that are not considered" (*California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043), and the question before the court in *Wells* was whether the public school districts were subject to suit under the CFCA's *false claims* provisions (§ 12651). The Supreme Court did not consider the question

28

before us in this appeal—whether public entities are subject to suit under the CFCA's *anti-retaliation* provision (§ 12653). Moreover, as Ryan notes, the court's analysis in *Wells* depended in significant part on the statute's definition of "person," and section 12653 does not use the same language:  It provides that a claim for unlawful retaliation may be brought by an "employee, contractor, or agent" against a "defendant."  (§ 12653, subds. (a), (b).)

For these reasons, *Wells* is not fully dispositive of the question before us.  But that does not mean that *Wells* is irrelevant to our analysis.  *Wells* explains that under traditional rules of statutory construction, governmental agencies are not included within a statute's general terms unless the statute expressly provides otherwise.  (*Wells*, *supra*, 39 Cal.4th at p. 1192.)  We find no such express provision in section 12653: That section says only that an action under the section may be brought by an "employee, contractor, or agent" against a "defendant."  (§ 12653.)  Further, like section 12651, section 12653 provides for judgments of two times the amount of a plaintiff's lost pay, plus interest, costs and attorney fees, and "where appropriate, punitive damages."  (§ 12653, subd. (b).) Like a judgment under section 12651, therefore, a judgment under section 12653 would divert "limited taxpayer funds" and "interfere significantly with government agencies' fiscal ability to carry out their public missions."  (*Wells*, at p. 1196.)[6]

Even more significantly, section 12653 provides that a plaintiff shall be entitled to relief if he or she suffers harm

---

[6]     The County notes in this regard that the total value of the alleged false claim was $23,682.  The judgment for Ryan nonetheless exceeded $5.3 million.

"because of lawful acts done by the [plaintiff] *in furtherance of an action under this section or other efforts to stop one or more violations of this article.*"  (§ 12653, subd. (a), italics added.)  In other words, by its plain language, section 12653 prohibits a particular kind of retaliation—i.e., retaliation against individuals who complain about or seek to address false claims *that are actionable under the CFCA*.  Because CFCA false claims actions cannot be pursued against public entities, section 12653's plain language suggests that CFCA retaliation claims also will not lie against such public entities.

Several other courts have concluded, as we do, that a plaintiff cannot recover under section 12653 if the plaintiff alleges retaliation for investigating wrongdoing that is not actionable under the CFCA's false claims provisions.  In *McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443 (*McVeigh*), the plaintiff filed an action under section 12653, alleging that he was fired because he reported fraud by his former employer, a recycling buy-back center, in connection with payments for recycled materials.  In affirming in part the trial court's grant of summary adjudication, the Court of Appeal explained that to establish a prima facie case of retaliation under the CFCA, a plaintiff must show " '(1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected activity; and (3) that the employer discriminated against the plaintiff *because he or she engaged in protected activity.*' "  (*McVeigh*, at p. 455, italics added.)  To establish protected activity, the plaintiff " 'does not have to file a false claims action or show a false claim was actually made,' " but he or she " 'must have reasonably based suspicions of a false claim *and it must be reasonably possible for the employee's*

30

*conduct to lead to a false claims action.*' " (*Id.* at p. 456, italics added.)  In other words, while it is "not ordinarily necessary for a court to confirm the merits of a potential qui tam suit in order to determine whether the plaintiff has engaged in protected conduct," a defendant is entitled to summary adjudication if "there is *no* possibility of a viable false claim." (*Id.* at p. 458.)  In the case before the court, the plaintiff's first cause of action alleged retaliation for plaintiff's reports of "weight tag inflation"—i.e., that defendant's employees inflated the weight of customers' recyclables in exchange for kickbacks—but the inflated weight tags were not the basis for any claims submitted to the state. (*Id.* at pp. 448–449, 452.)  Accordingly, the defendant was entitled to summary adjudication because any retaliation against the plaintiff for reporting weight tag inflation could not support a CFCA retaliation claim. (*Id.* at p. 458.)

The court similarly concluded in *Alborzi v. University of Southern California* (2020) 55 Cal.App.5th 155.  There, the plaintiffs, a physician and his medical corporation, sued a university and two physician groups, alleging that the defendants entered into an illegal referral/kickback scheme and stopped referring patients to the plaintiffs when they complained. (*Id.* at pp. 161–162.)  The plaintiffs' complaint alleged a variety of causes of action, including retaliation in violation of section 12653, to which the trial court sustained a demurrer. (*Alborzi*, at p. 162.)  The Court of Appeal affirmed. (*Ibid.*)  It explained:  " '[T]o constitute protected activity under the CFCA, the employee's conduct must be in furtherance of a false claims action. [Citation.]  The employee does not have to file a false claims action or show a false claim was actually made; however, the employee must have reasonably based suspicions of a false

31

claim and it must be reasonably possible for the employee's conduct to lead to a false claims action.' " (*Id.* at p. 182.) In the case before the court, the plaintiffs alleged that they were attempting to address financial wrongdoing, but "they have not connected that wrongdoing with any alleged false claims." (*Ibid.*) Thus, "plaintiffs have failed to allege facts sufficient to state a cause of action under the CFCA." (*Ibid.*; see also *Kaye v. Board of Trustees of San Diego County Public Law Library* (2009) 179 Cal.App.4th 48, 60 (*Kaye*) [plaintiff could not establish CFCA retaliation claim because his complaints that precipitated his firing did not reflect suspicions of a false claim].)

Applying these principles to the present case, we conclude that to prevail on his section 12653 claim, Ryan would have to demonstrate both that he had reasonable suspicions of a false claim *and* that it was " 'reasonably possible for [his] conduct to lead to a false claims action.' " (*Alborzi, supra,* 55 Cal.App.5th at p. 182; *McVeigh, supra,* 213 Cal.App.4th at p. 456; *Kaye, supra,* 179 Cal.App.4th at p. 60.) Ryan cannot not make the latter showing because under *Wells,* the County is not a proper defendant in a CFCA false claims action. In other words, even if the County retaliated against Ryan for reporting illegal activity, that retaliation could not be actionable under section 12653 because it was not "*in furtherance of* an action under this section or other efforts to stop one or more violations of this article." (§ 12653, subd. (a), italics added.) The County thus was entitled to judgment notwithstanding the verdict on Ryan's section 12653 claim.

Citing *Cordero-Sacks v. Housing Authority of City of Los Angeles* (2011) 200 Cal.App.4th 1267 (*Cordero-Sacks*), Ryan urges that the court's analysis in *Wells* does not apply to a section

12653 retaliation claim. *Cordero-Sacks* addressed a section 12653 claim brought by a plaintiff who alleged she was discharged by her former employer, a public housing authority (Authority), for investigating misuse of Authority funds. (*Id.* at p. 1272.) A jury returned a verdict for the plaintiff, and the Authority appealed, urging it was not a "person" subject to suit under section 12653. The Court of Appeal affirmed. It explained that while section 12651 authorizes actions against a "person," the then-current version of section 12653 provided that " '[*n*]*o employer* shall discharge . . . an employee . . . because of lawful acts done by the employee on behalf of the employee or others . . . in furthering a false claims action, including investigation for, . . . or assistance in, an action filed or to be filed under [the False Claims Act].' " (*Cordero-Sacks*, at p. 1274, quoting former § 12653, subd. (b).) Thus, while "[t]he Authority is . . . correct it is not a *person* from [whom] [the plaintiff] may recover money for the Authority's making a false claim[,] [plaintiff's] judgment rests . . . on the Authority's liability as an *employer* under the False Claims Act's prohibition against retaliatory discharge." (*Ibid.*) The court concluded that "employer" was not a subset of "person," such that "only employers who are 'persons' can be liable for retaliatory discharge." (*Ibid.*) Further, even if the plaintiff could not have pursued her *own* claim against the Authority, it was sufficient for purposes of section 12653 that the plaintiff was investigating "what might have been *the Authority's* false claims action" against a third party. (*Cordero-Sacks* at p. 1277.) Thus, the court concluded, the plaintiff was entitled to judgment against the Authority for violating section 12653.

Cordero-Sacks is inapposite. That case addressed a prior version of section 12653, which did not contain the statutory

language—"in furtherance of an action under this section or other efforts to stop one or more violations of this article" (§ 12653, subd. (a))—that drives our analysis.  Moreover, *Cordero-Sacks* concerned the plaintiff's investigation into whether a false claim had been submitted *to* a local public entity, and thus her investigation conceivably could have resulted in the public entity's false claim action against a third party.  Ryan was investigating an alleged false claim submitted *by* the County, and thus any resulting false claim action necessarily would name the County as a defendant, not a plaintiff.  Because *Wells* precludes false claim actions against public entities, Ryan's investigation therefore could not have resulted in a suit under the CFCA.

Ryan also contends *Wells* no longer is good law in light of 2012 amendments to the CFCA.  In brief, in 2012 the Legislature amended the CFCA to conform to the federal False Claims Act (FCA) in particular ways—namely, by (1) expanding whistleblower protections to include contractors and agents, (2) requiring a court to dismiss an action if substantially the same allegations were publicly disclosed; (3) amending the statute of limitations; (4) authorizing government employees to file CFCA claims relating to Medi-Cal fraud without having to exhaust internal claims procedures; (5) increasing civil penalties; and (6) updating various definitions.  (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 2492 (2011–2012 Reg. Sess.) as amended Apr. 16, 2012, p. 1.)  Ryan asserts that because the Legislature's purpose in adopting these amendments was to bring the CFCA into conformity with federal law—and because under a 2003 decision of the United States Supreme Court, municipal corporations are "persons" subject to suit under the federal FCA (*Cook County v. United States ex rel. Chandler* (2003) 538 U.S.

119, 122 (*Chandler*))[7]—the 2012 amendments to the CFCA "necessarily amended the term 'Person' as used in the CFCA under [s]ections 12651 and 12652 to include liability against the State and government entities." In other words, Ryan posits that although the 2012 amendments made no changes to the statutory definition of "person," the Legislature nonetheless intended— without saying so—to change the meaning of "person" articulated by the Supreme Court six years earlier. We decline to conclude that by leaving the definition of "person" unchanged, the Legislature intended to expand CFCA liability to public entities *sub silentio.* (See *Stone, supra,* 16 Cal.5th at p. 1079 ["it is difficult to conceive that by *failing to mention* employers at all in [Labor Code] section 2699, subdivision (a), the Legislature intended to import a broader definition and expand PAGA to public employers"].)

Ryan next contends that the County is subject to suit under section 12653 because the 2012 amendment to the CFCA expressly allows current and former government employees to file false claims actions for Medi-Cal fraud without exhausting internal procedures. (§ 12652, subd. (d)(4).) According to Ryan, "It follows that, because government employees are explicitly permitted to file false claims actions under Section 12651, such government employees are therefore entitled to protection under Section 12653 from retaliation by their government employer for attempting to prevent a false claim." We assume without deciding that government employees who are permitted to file CFCA actions—that is, those who assert that false claims were

---

[7] In *Wells*, our Supreme Court specifically concluded that its analysis was "not affected by" *Chandler*. (*Wells, supra,* 39 Cal.4th at p. 1197.)

submitted *to* their current or former employers—are entitled to protection from retaliation under section 12653.  But that principle has no application here, where as we have discussed, Ryan alleged he was investigating false claims submitted *by* his employer, which is not subject to suit under the CFCA's false claims provisions.

Ryan contends, finally, that since the 2012 amendment, courts have "permit[ted] plaintiffs to seek liability against public entities under section 12653."  But in the single case Ryan cites for this proposition, no party asserted that section 12653 claims could not be asserted against public entities, and thus the court had no occasion to consider the issue.  (See generally *Taswell v. Regents of University of California* (2018) 23 Cal.App.5th 343.)

For all the foregoing reasons, the County is not subject to suit under section 12653 under the facts of this case, and thus the trial court erred by denying the County's motion for judgment notwithstanding the verdict.  We therefore direct entry of judgment for the County on the second cause of action for violation of section 12653.  (E.g., *McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661 ["When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support plaintiff's cause of action, a judgment for defendant is required and no new trial is ordinarily allowed . . . ."]; *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919 [same].)  Further, because Ryan prevailed on *only* that cause of action, we also reverse the award of attorney fees and costs.  (*Garrabrants v. Erhart* (2023) 98 Cal.App.5th 486, 511 [" 'Our reversal of the judgment also necessarily compels the reversal of the award of attorney fees and costs to plaintiffs based on the judgment' "].)

36

Ryan contends the trial court erred by (1) sustaining the County's demurrer to the Health and Safety Code section 1278.5 retaliation claim; (2) granting the County's motion for summary adjudication of the wrongful termination aspects of Ryan's Labor Code section 1102.5 and Government Code section 12653 claims; and (3) denying Ryan's motion for leave to file a second amended complaint to include a cause of action for violation of the Bane Act, Civil Code section 52.1.  As we discuss, we reverse the order sustaining the demurrer and affirm the orders granting summary adjudication and denying Ryan's motion for leave to file an amended complaint.

## I.  The trial court erred by sustaining the demurrer to Ryan's Health and Safety Code section 1278.5 claim.

Ryan's first cause of action alleged a violation of Health and Safety Code[8] section 1278.5, which prohibits discrimination and retaliation against a whistleblower by a "health facility" or "[a]n entity that owns or operates a health facility."  (§ 1278.5, subd. (b)(1), (2).)  The County demurred, and the trial court sustained the demurrer on the ground that the claim cannot be asserted against a public entity.

On appeal, Ryan contends the County is subject to section 1278.5's anti-retaliation provisions because it is "[a]n entity that owns or operates a health facility" within the meaning of the statute.  For the reasons that follow, we agree.

---

[8]     For purposes of this section only, undesignated statutory references are to the Health and Safety Code.

## A. Legal principles.

" 'A demurrer tests the sufficiency of the plaintiff's complaint, i.e., whether it states facts sufficient to constitute a cause of action upon which relief may be based.' " (*Villarroel v. Recology, Inc.* (2023) 97 Cal.App.5th 762, 772.)  On appeal from an order sustaining a demurrer, " 'we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.  [Citation.]' (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.)" (*MACH-1 RSMH, LLC v. Darras* (2024) 103 Cal.App.5th 1288, 1299; see also *Stone, supra*, 16 Cal.5th at p. 1052 [where appeal is taken from an order sustaining a demurrer and involves questions of statutory interpretation, review is de novo].)

The question presented by the demurrer to the section 1278.5 claim is one of statutory interpretation.  As we have noted, our fundamental task in interpreting statutes is to ascertain the Legislature's intent.  (*Stone, supra*, 16 Cal.5th at p. 1052.)  Absent express words to the contrary, governmental entities normally are not included within general words of a statute if their inclusion would infringe on the entities' sovereign powers.  (*Id.* at p. 1053; see also *Wells, supra*, 39 Cal.4th at p. 1192.)  But this principle " 'cannot override positive indicia of a contrary legislative intent,' " and thus "[w]e must examine 'the language, structure, and history of the particular statute[s] before us' to determine whether the Legislature intended to impose their requirements on public employers." (*Stone,* at p. 1054.)

38

## B.     Language and structure of section 1278.5.

Section 1278.5, subdivision (b)(1) provides, in relevant part, that neither a "health facility" nor "[a]n entity that owns or operates a health facility" shall "discriminate or retaliate, in any manner, against a patient, employee, member of the medical staff, or other health care worker. . . because that person has . . . [¶] . . . [p]resented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity . . . [or] [¶]  . . . [h]as initiated, participated, or cooperated in an investigation or administrative proceeding related to the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility or its medical staff, or governmental entity."

"Health facility" for purposes of section 1278.5 means "a facility defined under this chapter [§§ 1250–1339.62] . . . ." (§ 1278.5, subd. (i).)  Section 1250 defines "health facility" as "a facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation and including care during and after pregnancy, or for any one or more of these purposes, for one or more persons, to which the persons are admitted for a 24-hour stay or longer." A "health facility" includes, among others, "the following types":

—A "[g]eneral acute care hospital," defined as "a health facility having a duly constituted governing body with overall administrative and professional responsibility and an organized medical staff that provides 24-hour inpatient care, including the following basic services:  medical, nursing, surgical, anesthesia,

39

laboratory, radiology, pharmacy, and dietary services." (§ 1250, subd. (a).) However, "[n]otwithstanding the requirements of this subdivision, a general acute care hospital operated by the Department of Corrections and Rehabilitation or the Department of Veterans Affairs may provide surgery and anesthesia services during normal weekday working hours, and not provide these services during other hours of the weekday or on weekends or holidays, if the general acute care hospital otherwise meets the requirements of this section." (*Ibid.*)

—A "[c]ongregate living health facility," defined as "a residential home with a capacity. . . of no more than 18 beds, that provides inpatient care, including . . . medical supervision, 24-hour skilled nursing and supportive care, pharmacy, dietary, social, [and] recreational [care]." (§ 1250, subd. (i)(1).) However, "[a] facility operated by a city and county for the purposes of delivering services under this section may have a capacity of 59 beds." (*Id.*, subd. (i)(4)(A).)

—A "[c]orrectional treatment center," defined as "a health facility operated by the Department of Corrections and Rehabilitation, the Department of Corrections and Rehabilitation, Division of Juvenile Facilities, or a county, city, or city and county law enforcement agency that . . . provides inpatient health services to that portion of the inmate population who do not require a general acute care level of basic services." (§ 1250, subd. (j)(1).)

Notwithstanding section 1278.5's other provisions, the statute "does not apply to an inmate of a correctional facility or juvenile facility of the Department of Corrections and Rehabilitation, or to an inmate housed in a local detention facility

40

including a county jail or a juvenile hall, juvenile camp, or other juvenile detention facility." (§ 1278.5, subd. (j).)

## C. As a matter of law, Health and Safety Code section 1278.5 applies to public entities.

As we have noted, " 'the Legislature is capable of bringing government entities within the scope of specific legislation when it intends to do so.' (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 678.)" (*Stone, supra*, 16 Cal.5th at p. 1055.) The language of sections 1278.5 and 1250 suggests that that the Legislature intended to do so here, where the statutory definition of "health facilities" expressly includes facilities operated by the state—i.e., " '[g]eneral acute care hospital[s]' . . . operated by the Department of Corrections and Rehabilitation or the Department of Veterans Affairs" and " '[c]orrectional treatment center[s]' . . . operated by the Department of Corrections and Rehabilitation [and] the Department of Corrections and Rehabilitation, Division of Juvenile Facilities" (§ 1250, subds. (a), (j)(1))—and by cities and counties—i.e., congregate living health facilities "operated by a city and county" and correctional treatment centers "operated by . . . a county, city, or city and county law enforcement agency" (§ 1250, subds. (i)(4)(A), (j)(1)). Finally, section 1278.5 expressly excludes from its coverage some patients of publicly run facilities—namely, "inmate[s] of a correctional facility or juvenile facility of the Department of Corrections and Rehabilitation, [and] inmate[s] housed in a local detention facility including a county jail or a juvenile hall, juvenile camp, or other juvenile detention facility. (§ 1278.5, subd. (j).) This exclusion would have been unnecessary if the statute excluded all publicly owned hospitals.

41

Other provisions of the statutory scheme also suggest that "health facilities" covered by the statute include public entities. Section 1265 provides that an application to operate a health facility may be filed by "[a] person, political subdivision of the state, or governmental agency . . . ." Section 1265.1, subdivisions (a) and (b) provide for denial of a licensure application by "a political subdivision of the state or other governmental agency" if the person in charge of the health facility has been convicted of a crime. Section 1265.8 sets out additional filing requirements for "any person, political subdivision of the state, or governmental agency desiring a license for a health facility." And, section 1298, subdivision (a)(1) provides that "[n]o person, firm, partnership, association, corporation, political subdivision of the state, or other governmental agency within the state shall continue to operate, conduct, or maintain an existing health facility without having applied for and obtained a license or a special permit as provided for in this chapter." For the foregoing reasons, the statute's " 'express words' " suggest a legislative intention to include public health facilities within the scope of section 1278.5. (See *Stone*, *supra*, 16 Cal.5th at p. 1053.)

The statute's legislative history supports the same conclusion. The Legislature enacted section 1278.5 in 1999 by adopting Senate Bill No. 97 (1999–2000 Reg. Sess.). As then enacted, section 1278.5 provided that any entity that violated the section would be subject to a civil penalty of not more than $25,000, and an employee retaliated against under the section would "be entitled to reinstatement, reimbursement for lost wages and work benefits caused by the acts of the employer, and the legal costs associated with pursuing the case." (Former Health & Saf. Code, § 1278.5, subds. (b)(2), (g) (Stats. 1999,

ch. 155, § 1.)  Legislative committee reports noted the bill's
expected fiscal impact to include "[p]otential costs at state
facilities from the General Fund.  Both state hospitals and
University of California hospitals, which are licensed health
facilities owned and operated by the state, would be responsible
for paying for fines and civil action incurred from violating
provisions in this bill."  (Sen. Health & Human Services Com.,
Analysis of Sen. Bill No. 97 (1999–2000 Reg. Sess.), Mar. 10,
1999, p. 3; see also Sen. Rules Com., Off. of Sen. Floor Analyses,
Rep. on Sen. Bill No. 97 (1999-2000 Reg. Sess.), as amended
June 8, 1999, pp. 4–5] ["Both state hospitals and University of
California (UC) hospitals are licensed health facilities owned and
operated by the state.  Operating departments or UC would be
responsible for paying any fines if health facility supervisors
violate these provisions and the civil action succeeds against the
state"]; Sen. Third Reading, Sen. Bill. No. 97 (1999–2000 Reg.
Sess.), as amended June 8, 1999, p. 2 ["Fiscal Effect:  According
to the Assembly Appropriations Committee analysis, this bill
could result in additional civil penalties against the state,
probably minor, to the extent proceedings are brought under this
bill against the state regarding employees of state hospitals,
developmental centers, and hospitals operated by the University
of California"]; Assem. Com. on Appropriations, Analysis of Sen.
Bill No. 97, as amended June 8, 1999, p. 1.)  In other words, the
Legislature specifically anticipated the bill would have a fiscal
impact on the state because state hospitals would be responsible
for paying fines and damages for violations of the bill.  That
anticipated fiscal impact could exist only if the Legislature
intended to make publicly operated health facilities subject to the
bill's provisions.

43

Subsequent legislative history supports the same conclusion.  The Legislature amended Health and Safety Code section 1278.5 in 2007 to expand the whistleblower protections to physicians and surgeons.  (Assem. Bill No. 632 (2007–2008 Reg. Sess.) §§ 1–2.)  Section 2 of the bill noted that the California Constitution requires the state to reimburse local agencies for certain costs mandated by the state, but that "[n]o reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction . . . ."  (*Id.*, § 2.)  In short, the Legislature specifically acknowledged that the bill would cause cities and counties to incur additional costs in the form of civil penalties, and that those civil penalties would not be reimbursable by the state.

In response to the foregoing, the County acknowledges that the statutory definition of "health facility" includes *some* publicly run facilities, but it suggests the Legislature "removed only certain 'types of facilities' from the general legislative presumption that a statute does not apply to governmental entities like the County."  This is not a reasonable construction of the statute, which refers to state, county, and city facilities throughout its definitions of "health facilities," and which is embedded in a statutory scheme that repeatedly refers to licensure of hospitals and other health facilities by "political subdivision[s] of the state, or governmental agenc[ies]."  (See §§ 1265, 1265.8, 1298.)  Nor does the County fully grapple with section 1278.5's legislative history.  The County acknowledges that the committee reports discussing the initial version of section 1278.5 in 1999 evinced an intent to apply the statute to

44

state-run hospitals, but it urges that no legislative history materials "address[ ] a *county*-operated hospital." But the County does not suggest why the Legislature would have intended the statute to apply to some public entities and not others, nor does it address the legislative history of the 2007 amendment, which specifically refers to cities and counties.

Finally, the County suggests that interpreting section 1278.5 to include public hospitals would infringe on the County's sovereign powers, a result that "cannot be lightly presumed." But our Supreme Court has made clear that "a sovereign powers analysis [may not] take precedence over contrary indications of legislative intent." (*Stone*, *supra*, 16 Cal.5th at p. 1067.) To the contrary, the high court has explained: "According to plaintiffs, 'Under the sovereign powers maxim only those entities whose sovereign powers . . . would be infringed by application of the statute are exempt from those statutes.' This analysis puts the cart before the horse. 'Maxims of statutory construction . . . are not immutable rules but instead are guidelines subject to exceptions.' [Citation.] While interpretive maxims are helpful aids to statutory construction, they are to be consulted only when statutory language is unclear. [Citation.] . . . In other words, the sovereign powers maxim 'cannot override positive indicia of a contrary legislative intent.' (*Wells*, *supra*, 39 Cal.4th at p. 1193.)" (*Ibid.*)

For all the foregoing reasons, the trial court erred by sustaining the County's demurrer to Ryan's cause of action for violations of section 1278.5.

45

## II.     The trial court did not err by granting in part the County's motion for summary adjudication.

As described above, the trial court summarily adjudicated Ryan's claims that his termination violated Government Code section 12653 and Labor Code section 1102.5.  Ryan challenges the grant of summary adjudication, urging that the trial court erred by summarily adjudicating less than an entire cause of action, and triable issues of material fact precluded summary adjudication.

We have already concluded that the County is not subject to suit under Government Code section 12653 (see County's Appeal, section II), so we need not address the grant of summary adjudication as it relates to that cause of action.  For the reasons that follow, we conclude that the trial court properly granted summary adjudication of Ryan's Labor Code[9] section 1102.5 termination claim.

### A.     The trial court did not err by summarily adjudicating less than a complete cause of action.

We begin by addressing Ryan's contention that the trial court erred by granting the County's motion for summary adjudication because it did not completely dispose of Ryan's cause of action under section 1102.5.  Ryan's first amended complaint alleged that the County retaliated against him in violation of section 1102.5 by creating intolerable working conditions *and* by terminating his employment.  The County moved for summary adjudication only as to the wrongful termination aspect of the

---

[9]     For purposes of this section only, undesignated statutory references are to the Labor Code.

46

claim, asserting that the undisputed evidence demonstrated that Ryan would have been terminated for legitimate, independent reasons even if he had not engaged in activities protected by section 1102.5.  Ryan contends that the motion violated Code of Civil Procedure section 437c, subdivision (f)(1), which provides that a motion for summary adjudication may be granted "only if it *completely disposes* of a cause of action, an affirmative defense, a claim for damages, or an issue of duty."  (Italics added.)

The County responds that Ryan forfeited this issue by failing to raise it below.[10]  We agree.  " 'Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments.  [Citation.]  An argument or theory will . . . not be considered if it is raised for the first time on appeal.  [Citation.]  Specifically, in reviewing a summary judgment, the appellate court must consider only those facts before the trial court, disregarding any new allegations on appeal.  [Citation.] . . . 'A party is not permitted to change his position and adopt a new and different theory on appeal.  To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' (*Ernst v. Searle* (1933) 218 Cal. 233, 240– 241.)" (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676 (*DiCola*); see also *Miller v. Pacific Gas & Electric Co.* (2023) 97 Cal.App.5th 1161, 1170

---

[10]    Alternatively, the County contends there was no error because where two or more separate and distinct wrongful acts are combined in the same cause of action in a complaint, " 'a party may present a summary adjudication motion that pertains to some, but not all, of the separate and distinct wrongful acts.' " We need not reach this issue because we conclude Ryan forfeited it.

47

(*Miller*) [plaintiff forfeited argument that summary judgment should be reversed by failing to raise it in trial court].)

Below, the County asserted in its moving papers that it could properly seek summary adjudication of Ryan's claim that his termination violated section 1102.5 because his first amended complaint identified Ryan's discharge as a distinct wrongful act. Ryan did not suggest in response that the summary adjudication motion was procedurally improper, and thus the contention is forfeited.

Ryan urges that he did not forfeit his right to raise the alleged error because the trial court exceeded its jurisdiction by granting the motion for summary adjudication and, thus, its order is void. Not so. Our Supreme Court has explained that a claim of error is unwaivable *only* if it is based on a lack of "fundamental jurisdiction[ ]"—that is, " ' " 'an entire absence of power to hear or determine the case, *an absence of authority over the subject matter or the parties.*' " ' " (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 339 (*Kabran*), italics added.) In contrast, a court that has fundamental jurisdiction but "violate[s] procedural requirements, order[s] relief that is unauthorized by statute or common law, or otherwise " ' "fail[s] to conduct [itself] in the manner prescribed" ' by law" acts " ' "in excess of jurisdiction." ' " (*Ibid.*) Because a court that acts in excess of jurisdiction "has 'jurisdiction over the subject matter and the parties in the fundamental sense' [citation], any such act is 'valid until set aside, and parties may be precluded from setting it aside by such things as waiver, estoppel, or the passage of time' [citation]." (*Id.* at pp. 339–340.)

Here, the trial court unquestionably had jurisdiction over the parties and the subject matter of this litigation. Thus, even if

48

the trial court's grant of summary adjudication of a part of Ryan's section 1102.5 claim was unauthorized, the court still would not have lacked " '*fundamental* jurisdiction resulting in "an entire absence of power to hear or determine the case." ' " (*Kabran, supra*, 2 Cal.5th at p. 341; see also *People v. The North River Ins. Co.* (2020) 58 Cal.App.5th 300, 311 ["When a summary judgment is 'entered "in excess of jurisdiction," ' it is voidable," not void].) The order granting summary adjudication therefore is, at most, voidable, and Ryan's claim that the trial court lacked jurisdiction to grant the motion for summary adjudication cannot be raised for the first time on appeal.

### B. The trial court properly granted summary adjudication of Ryan's claim that his termination violated section 1102.5.

#### 1. Standard of review.

We independently review the trial court's order granting summary adjudication. In doing so, we consider all the evidence before the trial court except that to which objections were made and sustained, and we view the evidence in the light most favorable to the nonmoving party. (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206.) Although our review is de novo, appellant bears the burden of demonstrating error. (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 372; *Christoff v. Union Pacific Railroad Co.* (2005) 134 Cal.App.4th 118, 125.)

In exercising our independent review, we apply the standards applicable to summary adjudication motions. A defendant moving for summary adjudication has an initial burden to make a prima facie showing that one or more elements

49

of the cause of action cannot be established or that there is a complete defense.  (Code Civ. Proc., § 437c, subds. (f)(1), (o), (p)(2); *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850–851.)  Once the defendant meets its burden, the burden shifts to the plaintiff to show the existence of material disputed facts.  (*Aguilar*, at pp. 850–851.)  Summary adjudication is properly granted only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

### 2. The undisputed evidence established that Ryan would have been terminated even if he had not engaged in activities protected by section 1102.5.

Section 1102.5 provides whistleblower protections to employees who disclose wrongdoing.  Specifically, section 1102.5, subdivision (b) prohibits an employer from retaliating against an employee for sharing information the employee "has reasonable cause to believe . . . discloses a violation of state or federal statute, or . . . a local, state, or federal rule or regulation" with "a government or law enforcement agency, . . . a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation." Section 1102.5, subdivision (c) prohibits an employer from retaliating against an employee for refusing to participate in an activity that would result in a violation of a state or federal statute or a local, state, or federal rule or regulation.

Section 1102.6 sets forth the burdens of proof applicable to section 1102.5 claims.  That section says:  "In a civil action or administrative proceeding brought pursuant to Section 1102.5,

once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5."

In *Lawson v. PPG Architectural Finishes, Inc*. (2022) 12 Cal.5th 703, 712, our Supreme Court clarified section 1102.6's standards and burdens of proof as follows:  "First, it must be 'demonstrated by a preponderance of the evidence' that the employee's protected whistleblowing was a 'contributing factor' to an adverse employment action.  (§ 1102.6.)  Then, once the employee has made that necessary threshold showing, the employer bears 'the burden of proof to demonstrate by clear and convincing evidence' that the alleged adverse employment action would have occurred 'for legitimate, independent reasons' even if the employee had not engaged in protected whistleblowing activities."

In its summary adjudication motion, the County asserted that undisputed evidence established that Ryan would have been terminated for legitimate reasons—namely, because his staff privileges at Harbor-UCLA lapsed after he failed to submit a complete reappointment application—even if he had not engaged in activities protected by section 1102.5.  In support, the County proffered the PSA Bylaws (bylaws), which provide for the organization of the Harbor-UCLA medical staff, including the procedures by which members of the medical staff are appointed and reappointed.  As relevant here, the bylaws provide that

51

appointments to the medical staff shall be for periods of not more than 24 months. Members are required to submit applications for reappointment at least 120 days before their appointments expire, and "[i]f an application for reappointment is not received at least thirty (30) days prior to the expiration date, the member shall be deemed to have voluntarily resigned his/her Association membership and clinical privileges."

The bylaws require that applications for appointment or reappointment to the medical staff be made on forms approved by the PSA's Executive Committee. Reappointment applications must include all information necessary to update and evaluate the applicant's qualifications, and the applicant "shall have the burden of producing adequate information for a proper evaluation of the applicant's qualifications and suitability for the membership category and clinical privileges requested, for resolving any doubts about these matters, and for satisfying all requests for information." The bylaws also provide that by applying for appointment, each applicant:

(1) "[A]uthorizes representatives of the County of Los Angeles, the Association, and/or the professional schools, to consult with members of medical staffs of other hospitals or health facilities with which the applicant has been associated and with others who may have information bearing on his/her current competence, ethical character, adequate physical and mental health status, and other qualifications and authorizes such individuals and organizations to candidly provide such information;"

(2) "[R]eleases from any liability the County of Los Angeles, the Association, the professional schools, and their respective officers, employees or agents, for any of their acts

52

performed in good faith and without malice in connection with evaluating the applicant and his/her credentials and other qualifications;" and

(3) "[R]eleases from any liability all individuals and organizations that provide information to the County of Los Angeles, the Association, the professional schools, and their respective officers, employees or agents in good faith and without malice concerning the applicant's current competence, ethical character, adequate physical and mental health status, and other qualifications for Association membership and clinical privileges, including otherwise privileged or confidential information."

The bylaws provide that any committee charged with reviewing an application for appointment or reappointment to the medical staff may request further documentation from an applicant.  If the applicant fails to respond within 30 days, the application "shall be deemed withdrawn, and processing of the application . . . will be discontinued."  Once the application is complete, the chair or departmental committee to which the application is submitted shall review and evaluate the application and make a written recommendation.  The recommendation shall be transmitted to the Credentials Committee, and then to the Executive Committee, which shall submit a written report and recommendation to the Los Angeles County Board of Supervisors.

Ryan signed the releases required by the bylaws when he applied for medical staff privileges in 2013 and 2015.  He refused to sign the same release in 2017, however, crossing out "I release" and writing in "I DO NOT RELEASE."  The PSA informed Ryan in September and October 2017 that his application was incomplete because it did not include the required release

53

language. The PSA asked Ryan to resubmit his application without edits, and it advised him that if it did not receive his revised application within 30 days, his application was subject to being deemed withdrawn or denied. This deadline was extended several times, with the last extension expiring on June 13, 2018. Ryan did not sign and return the unaltered release, and the PSA deemed Ryan's privileges to have lapsed on June 14, 2018. Thereafter, the County Department of Health Services discharged Ryan in October 2018. The written notice of discharge stated that the County's action was "based on your lack of clinical privileges which prevents you from providing patient care."

The County's evidence satisfied its burden to make a showing by clear and convincing evidence that Ryan would have been terminated even if he had not engaged in protected activities. Specifically, the County's evidence demonstrated that every candidate for reappointment to the medical staff was required to release the County and others from liability for actions performed in good faith and without malice in connection with evaluating the candidate's fitness for reappointment; that Ryan refused to sign the releases, even after being warned that his failure to do so would cause his application to be deemed withdrawn; that medical staff privileges were required for employment as a surgeon at Harbor-UCLA; and that Ryan's medical staff privileges lapsed in June 2018 because Ryan did not submit a complete reappointment application. Accordingly, the County demonstrated a legitimate, nonretaliatory reason for Ryan's termination—namely, his failure to agree to the releases of liability required of all physicians seeking privileges to practice at Harbor-UCLA.

In opposition to the County's motion for summary adjudication, Ryan did not dispute that he refused to sign the releases that were part of his application for reappointment or that the bylaws dictated the language of the releases.  Ryan also did not dispute that his staff privileges were up for regular biannual review in September 2017, were temporarily extended through June 13, 2018, and were deemed to have lapsed on June 14, 2018 because he did not submit an unaltered application for reappointment.  Finally, Ryan did not dispute that without staff privileges he was ineligible to practice medicine at Harbor-UCLA.  He contended, however, that requiring him to sign the release was retaliatory in his unique circumstances because he had an active case against the County, the reappointment application "contained a broad release of all of his rights against the County," and the County gave him no assurances that the release would not jeopardize his existing claims.  Thus, he urged, he "could not and did not agree to release his rights against the County."  (Italics and capitalization omitted.)

On appeal, Ryan does not contend that the PSA's standard-form waiver was unlawful as applied to him because it conditioned his continued employment on his agreement to release his pending claims against the County.  Instead, Ryan urges that it was illegitimate for the County to require him (or any other physician) to sign the releases as a condition of reappointment because the releases gave the hospital broader immunity than provided by statute and, thus, were overbroad and illegal.  Ryan's contention is as follows.  Civil Code section 43.7, subdivision (b) immunizes members of a hospital's professional staff committees, peer review committees, and governing board for acts taken to review the quality of medical

55

services provided by staff members if the committee or member "acts without malice, has made a reasonable effort to obtain the facts of the matter as to which he, she, or it acts, and acts in reasonable belief that the action taken by him, her, or it is warranted by the facts known to him, her, or it after the reasonable effort to obtain facts." Civil Code section 43.7, subdivision (e) provides that this section shall not be construed to confer immunity from liability on "any . . . hospital." Ryan contends that the release in the reappointment application was "illegal" because it "is much broader than the statutory immunity in Civil Code section 43.7(b), and it directly contradicts the exclusions of hospitals in Civil Code section 43.7(e)." (Italics omitted.) And, he contends that the County violated section 1102.5 by terminating him for refusing to sign an "illegal contract."

We conclude that Ryan forfeited this contention by failing to raise it in opposition to the motion for summary adjudication. As we have said, the forfeiture rules apply equally to an appeal from a grant of summary judgment or summary adjudication, and thus a party is not permitted to change his position and adopt a new and different theory on appeal. (*DiCola*, *supra*, 158 Cal.App.4th at p. 676; *Miller*, *supra*, 97 Cal.App.5th at p. 1170.) In the trial court, Ryan made just a passing reference to the alleged illegality of the releases, asserting in a single sentence that he "refused to sign the privilege renewal unaltered because the release language was inconsistent and much broader than the statutory immunities under California law." Ryan did not explain *why* the releases allegedly were inconsistent with California law, nor did he cite Civil Code section 43.7. Accordingly, he forfeited the contention. (E.g., *People v. Ramirez*

(2024) 104 Cal.App.5th 315, 329–330 [contention forfeited if party fails to cite to relevant legal authority or to develop cogent legal argument]; *Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785, 799 ["[p]oints must be supported by reasoned argument, authority, and record citations, or may be deemed forfeited"].)

In any event, Ryan's contention regarding the alleged illegality of the releases does not give rise to triable issues of material fact as to his section 1102.5 retaliation claim. As noted above, section 1102.5, subdivision (b) prohibits an employer from retaliating against an employee for disclosing suspected violations of state or federal law. Thus, to demonstrate triable issues of fact under section 1102.5, subdivision (b), Ryan would have had to point to facts raising an inference that Ryan's whistleblowing activity was a contributing factor to the adverse employment action—that is, that the County required Ryan to sign the releases, or deemed his staff privileges to have lapsed for failing to sign the releases, at least in part *because* Ryan reported alleged wrongdoing by Dr. White and other vascular surgeons. Ryan failed to do so. Specifically, he did not demonstrate that the releases were not required of other candidates for appointment to the medical staff, or that any other physician refused to sign the releases but was granted staff privileges nonetheless. Ryan also did not demonstrate that any other physician remained employed by Harbor-UCLA even in the absence of staff privileges. Accordingly, Ryan failed to show a causal link between the protected activity and the alleged retaliation, and thus he did not raise a triable issue that his termination violated section 1102.5, subdivision (b).

Ryan's contention regarding the illegality of the releases also does not give rise to triable issues of material fact under

57

section 1102.5, subdivision (c). As noted above, section 1102.5, subdivision (c) prohibits an employer from retaliating against an employee "for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Ryan asserts that "[b]ecause Civil Code section 43.7(e) expressly excludes hospitals from immunity, [the County's] insistence that Dr. Ryan, as a condition of his continued hospital privileges and employment, execute a contract that expressly provides immunity to a hospital is itself illegal activity." And, Ryan urges, terminating him for refusing to execute the releases violated section 1102.5, subdivision (c) because it constituted retaliation "for refusing to participate in an unlawful contract that included an illegal release provision."

There are many problems with Ryan's contentions, including that Ryan's argument assumes, without any analysis, that it was illegitimate or illegal for the County to require a more comprehensive release than existed by operation of law under Civil Code section 43.7. Nothing in Civil Code section 43.7's plain language supports Ryan's analysis, however, nor is Ryan's contention supported by the other statutory provision he cites (§§ 432.5, 925; Bus. & Prof. Code, § 809, subd. (a); Civ. Code, § 43.97. [11]

---

[11] Section 432.5 provides: "No employer . . . shall require any employee . . . to agree, in writing, to any term or condition which is known by such employer . . . to be prohibited by law."

Section 925, subdivision (a)(2), provides that an employer shall not require an employee who primarily resides and works in California to agree to a provision that would "[d]eprive the

58

The only case Ryan cites that arguably supports his claim is *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465 (*Westlake*).[12] *Westlake* concerned a doctor's action against a hospital and individual members of its boards and committees, alleging damages resulting from the hospital's revocation of the doctor's staff privileges. (*Id.* at pp. 469–470.) The defendants sought summary judgment on a variety of grounds, including under a section of hospital bylaws providing that " '[e]ach member of, or applicant to, the Medical and Dental Staff, waives any right of personal redress against the Medical and Dental

---

employee of the substantive protection of California law with respect to a controversy arising in California."

Business and Professions Code section 809 states that "[p]eer review, fairly conducted, is essential to preserving the highest standards of medical practice," and "[p]eer review that is not conducted fairly results in harm to both patients and healing arts practitioners by limiting access to care."

Civil Code section 43.97 provides that a hospital shall not incur liability for taking an action recommended by its medical staff if the action is reported in accordance with Business and Professions Code section 805.

[12] Two other cases Ryan cites are irrelevant to the present dispute. (See *McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 616 [where Government Claims Act permitted class action claims by taxpayers against local governments for refund of unlawful tax " 'in the absence of a specific tax refund procedure set forth in an applicable governing claims statute,' " municipality could not prohibit class tax claims by local ordinance because a local ordinance is not a "statute" within the meaning of the Government Claims Act]; *Sipple v. City of Hayward* (2014) 225 Cal.App.4th 349, 357 [Government Claims Act preempts local ordinances].)

Staff, the Judicial Review Committee, the Governing Board or any member thereof, for disciplinary action taken under this Article.' " (*Id.* at p. 479.)  The court concluded that the clause was unenforceable because, among other things, it waived a right of redress for intentional conduct and concerned highly regulated matters of great public significance.  (*Id.* at pp. 480–481.)  The court therefore denied the defendant's motion for summary judgment.

The release in the present case is far narrower than the one at issue in *Westlake*:  While the *Westlake* release covered "*any right* of personal redress . . . for disciplinary action" (*Westlake, supra*, 17 Cal.3d at p. 479, italics added), the release here released the County and its officers and employees only from "acts performed in good faith and without malice in connection with evaluating the applicant and his/her credentials and other qualifications."  In any event, nothing in *Westlake* suggests that the release here was not merely unenforceable, but also "illegal," such that signing it would have "result[ed] in a violation of state . . . statute." (§ 1102.5, subd. (c).)  *Westlake* thus does not support Ryan's contention that terminating him for refusing to sign the release constituted unlawful retaliation in violation of section 1102.5, subdivision (c).

Finally, Ryan contends the trial court erred by granting summary adjudication of his section 1102.5, subdivision (c) claim because the County's motion for summary adjudication did not address that claim.  We do not agree.  The County's notice of motion sought summary adjudication of "[t]he separate and distinct allegedly wrongful act of termination of employment, alleged in the first cause of action in the First Amended Complaint ('FAC') . . . for retaliation *in violation of Labor Code*

60

*section 1102.5*" and "[t]he separate and distinct allegedly wrongful act of 'causing Dr. Ryan's clinical privileges to be revoked,' alleged in the first cause of action in the FAC for retaliation *in violation of Section 1102.5*," and the County's memorandum contended that there was no causal link between Ryan's termination/loss of privileges and protected activity. (Italics added.) Accordingly, the trial court properly concluded that its summary adjudication ruling was "not limited to any subdivision of Labor Code § 1102.5 . . . but applied to [the entire] cause[ ] of action to the extent [it] alleged Plaintiff's final termination of privileges and termination of employment [was] retaliatory."

For all of these reasons, the trial court did not err by granting the County's motion for summary adjudication.

## III. The trial court did not abuse its discretion by denying Ryan's motion for leave to file a second amended complaint.

Ryan contends, finally, that the trial court abused its discretion by denying his request to file a second amended complaint. We find no abuse of discretion.

### A. Background.

In October 2021, Ryan filed a motion for leave to file a second amended complaint (SAC) to add a new cause of action alleging a violation of the Bane Act (Civ. Code, § 52.1). The Bane Act provides that if a person interferes or attempts to interfere "by threat, intimidation, or coercion, with the exercise or enjoyment by any individual . . . of rights secured by the Constitution or laws of the United States, or . . . of this state," the individual may bring a civil action for damages and injunctive

61

and equitable relief.  (Civ. Code, § 52.1, subds. (b), (c).)  Ryan's proposed amendment alleged that the County took a variety of "intimidating, threatening, and/or coercive actions," including rejecting Ryan's reapplication for staff privileges, allowing Ryan's staff privileges to lapse, failing to properly investigate Ryan's concerns, revoking Ryan's staff privileges, refusing to negotiate in good faith over the language in the renewal application, and demanding that Ryan agree to the unedited release or face discharge.

The County opposed the motion for leave to amend.  It asserted that the proposed SAC would add new legal and factual issues nearly six years after the action was filed and only 50 days before trial, and that it suffered from numerous legal defects.

The court denied the motion for leave to amend.  It explained: "The present motion was unreasonably delayed, and allowing amendment now would prejudice [the County].  [Ryan] seeks to revive his claims based on wrongful discharge, but on a new gravamen:  not one based on retaliatory animus toward him specifically, but upon the alleged illegality of [the County's] release requirements in general.  He seeks to change the nature of his claims at a late stage in this litigation:  The Complaint in this action was filed on January 8, 2016, more than five years ago, and trial is set for January 12, 2022, one week from now.

"The basis for this claim was not newly discovered:  [Ryan] had notice of the asserted reason for his discharge when it happened in 2018, but he did not assert a claim based on the purported illegality of that basis until after this court granted [the County's] motion for summary adjudication in June of last year.  The nature of the amendment sought is thus tardy,

62

grounded in litigation strategy rather than new information, and likely to cause further delays in this already delayed proceeding.

"[The County] is also correct that the Bane Act claim is defective in substance. A claim under Civil Code § 52.1 requires a showing that the defendant interfered or attempted to interfere with one's legal rights 'by threat, intimidation, or coercion.' (Civ. Code § 52.1, subd. (b).) Several bodies of authority, mandatory and persuasive, suggest the Bane Act requires violence or threat of violence to state a claim. The statute itself states that 'Speech alone is not sufficient to support an action brought pursuant to subdivision (a) or (b), except upon a showing that the speech itself threatens violence against a specific person or group of persons.' (Civ. Code § 52.1, subd. (k).) California appellate decisions have interpreted the statute to require a showing of violence or threats of violence (see *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 111; *Gabrielle A. v. County of Orange* (2017) 10 Cal.App.5th 1268, 1290) as has the Judicial Council of California's Advisory Committee on Civil Jury Instructions. (*See* CACI 3066 Bane Act.) [¶] . . . [¶]

"Here, there is no contention in [Ryan's] proposed complaint that [the County] threatened violence against him to persuade him to sign the release. Such a claim is outside the ambit of the Bane Act."

## B. Analysis.

A plaintiff may amend his complaint "once without leave of the court at any time before the answer, demurrer, or motion to strike is filed, or after a demurrer or motion to strike is filed but before the demurrer or motion to strike is heard . . . ." (Code Civ. Proc., § 472, subd. (a).) Thereafter, the trial court may allow

63

further amendment "in its discretion, . . . upon any terms as may be just." (*Id.*, § 473, subd. (a)(1).) Such amendments generally may occur " 'at any time before or after commencement of trial, in the furtherance of justice' ([*id.*,] § 576) so long as the amendments do not raise new issues against which the opposing party has had no opportunity to defend." (*North Coast Village Condominium Assn. v. Phillips* (2023) 94 Cal.App.5th 866, 881 (*North Coast Village*); see also *Doe v. Second Street Corp.* (2024) 105 Cal.App.5th 552, 577–578 [same].)

"Although amendments are to be liberally allowed, . . . 'a court may deny a good amendment in proper form where there is unwarranted delay in presenting it.' " (*Alameda Health System v. Alameda County Employees' Retirement Assn.* (2024) 100 Cal.App.5th 1159, 1189; see also *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1377.)

" '[L]eave to amend a complaint is entrusted to the sound discretion of the trial court, and . . . the exercise of that discretion will not be disturbed on appeal absent a clear showing of abuse of discretion.' (*McMillin v. Eare* (2021) 70 Cal.App.5th 893, 909.)" (*North Coast Village, supra,* 94 Cal.App.5th at p. 881; *Singh v. Southland Stone, USA* (2010) 186 Cal.App.4th 338, 355.) The burden is on the appellant to demonstrate that the trial court abused its discretion. (*Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1147.) We will reverse only if "in the circumstances of the case, viewed most favorably in support of the decision, the decision exceeds 'the bounds of reason' [citation], and therefore a judge could not reasonably have reached that decision under applicable law." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.)

64

The trial court did not abuse its discretion by denying Ryan's motion for leave to amend his complaint.  As the trial court noted, Ryan's proposed amendment sought to put back at issue whether the County's termination of Ryan was tortious—that is, the very question the trial court had already summarily adjudicated.  Ryan sought to do so, moreover, nearly *six years* after he filed the present action, shortly before trial was scheduled to begin, and after a full round of briefing on the County's motion for summary adjudication.

Ryan asserts that the trial court abused its discretion by denying his motion for leave to amend because the proposed addition of the Bane Act claim "(1) related to the same general set of facts; (2) neither required the addition of any new facts nor any new discovery; and (3) did not in any way prejudice the County."  Not so.  While the new claim concerned many of the same facts alleged in the Labor Code section 1102.5 and Government Code section 12653 claims, those claims had been resolved by way of summary adjudication and thus were no longer at issue in the upcoming trial.  Permitting the amendment would have revived Ryan's claim that his termination was tortious.  It would have done so, moreover, *after* the time to file motions for summary adjudication or summary judgment had passed.  (Code Civ. Proc., § 437c, subd. (a)(2) [notice of motion must be served 81 days before hearing].)  Permitting the amendment, therefore, manifestly was prejudicial to the County.

## IV. We return the Health and Safety Code section 1278.5 claim to the trial court for further proceedings.

Having concluded that the trial court erred by sustaining the County's demurrer to Ryan's Health and Safety Code

65

section 1278.5 claim, we must consider whether that claim should be returned to the trial court for further proceedings.

An order erroneously sustaining a demurrer generally is prejudicial to the plaintiff who is "depriv[ed] of the opportunity to prove his cause of action." (*Deeter v. Angus* (1986) 179 Cal.App.3d 241, 251.)[13]  However, a plaintiff is not prejudiced by an erroneous ruling sustaining a demurrer as to particular cause of action if another cause of action based on the same factual allegations was resolved against the plaintiff at trial. (*Curtis v. Twentieth Century-Fox Film Corp*. (1956) 140 Cal.App.2d 461, 464–465; see also *Grell v. Laci Le Beau Corp*. (1999) 73 Cal.App.4th 1300, 1307 [error harmless when subsequent summary judgment on statute-of-limitations grounds would have disposed of claims erroneously dismissed on demurrer]; *Tanguilig v. Neiman Marcus Group, Inc*. (2018) 22 Cal.App.5th 313, 334 [any error in sustaining demurrer not prejudicial where plaintiff failed to bring suit to trial within five years].)

Here, as we have noted, the jury returned a split verdict. As to the Labor Code section 1102.5 claim, the jury returned a verdict for the County, finding that Ryan disclosed what he believed was illegal conduct, the County took adverse action against Ryan, but Ryan's disclosure was *not* a contributing factor in the County's adverse action against him.  The jury returned a verdict for Ryan as to the CFCA claim, finding that Ryan reported what he believed was a false medical record in support of a false claim, the County took adverse action against him,

---

[13]    For this reason, we decline to conclude, as the County urges, that Ryan forfeited his claim of error by failing to demonstrate prejudice.

Ryan's acts to stop a false claim were a substantial motivating reason for the County's decision to take adverse action against him, and the County's conduct *was* a substantial factor in causing harm to Ryan. Finally, as to damages, the jury awarded Ryan $0 for past and future lost earnings, $2 million for past mental suffering and emotional distress, and $100,000 for future mental suffering and emotional distress.

The County urges that Ryan cannot demonstrate prejudice because the jury rejected his Labor Code section 1102.5 retaliation claim. However, the County has not persuasively demonstrated to this court why a jury could not return a verdict for Ryan on the Health and Safety Code section 1278.5 claim for the same reason it returned a verdict for him on the CFCA claim.

For these reasons, we will return the Health and Safety Code section 1278.5 claim to the trial court for further proceedings. In doing so, we note that many issues—including Ryan's claim that his termination was wrongful—have already been resolved and are law of the case in further proceedings. Other factual issues relevant to the Health and Safety Code section 1278.5 claim may have been resolved by the jury's verdict and need not be presented to a trier of fact. We express no opinion regarding this issue, which we believe is best decided by the trial court in the first instance.

## DISPOSITION

Judgment is entered for the County on the Government Code section 12653 claim. The order sustaining the demurrer to the cause of action alleging retaliation in violation of Health and Safety Code section 1278.5 is reversed, and that cause of action is returned to the trial court for further proceedings consistent with this opinion. The judgment is otherwise affirmed. The parties shall bear their own costs on appeal.

## CERTIFIED FOR PARTIAL PUBLICATION

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.

68